**WHITE MOUNTAIN BROADCASTING CO., INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 76–2009.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1978.

Decided April 9, 1979.

Rehearing Denied May 30, 1979.

Federal Communications Commission denying the application of appellant, White Mountain Broadcasting Co., for a renewal of its license for two radio stations in Berlin, New Hampshire.[1] *White Mountain Broadcasting Inc.*, 60 F.C.C.2d 342 (July 12, 1976), *recon. denied*, 61 F.C.C.2d 472 (October 12, 1976). The Commission's action was based upon a finding that appellant had engaged in double or fraudulent billing, with the knowing participation of one Robert Powell—its president, treasurer, director and sole shareholder. The issue to be decided is whether the Commission improperly failed to distinguish its action here from contrary results reached in what are claimed to be similar cases. For the reasons stated below, we hold that it did not.

Jerome S. Boros, Alan B. Kaufman, New York City, was on brief, for appellant.

Thomas R. King, Jr., Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Julian R. Rush, Jr., Counsel, were on brief, Werner K. Hartenberger, Washington, D.C., for F.C.C.

Before LEVENTHAL and ROBINSON, Circuit Judges and HAROLD H. GREENE,* United States District Court Judge for the District of Columbia.

Opinion for the Court filed by HAROLD H. GREENE, District Judge.

HAROLD H. GREENE, District Judge:

This is an appeal pursuant to section 402(b) of the Communications Act of 1934, 47 U.S.C. § 402(b), from a decision of the

I

■ Double billing is the "furnishing of false information concerning broadcast advertising to any party contributing to the payment of such advertising, the purpose being to induce such party to pay more than the actual rate for the advertising." *Fraudulent Billing Practices*, 1 F.C.C.2d 1068 (1965). The Commission has condemned this practice as "amounting to the use of broadcast facilities for fraudulent purposes, reflect[ing] adversely on the qualifications of a licensee and, to a degree on the industry as a whole," and impacting adversely upon the public interest, convenience, and necessity which demand "reasonably ethical business practices in the industry," *Fraudulent Billing Practices*, 23 F.C.C.2d 70, 71 (1970),[2] and it has promulgated a rule which expressly prohibits a licensee from engaging or participating in double billing.[3]

---

\* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The two stations are standard broadcast station WMOV and FM station WXLQ.

2. The Commission has also noted that fraudulent billing may injure competitive stations not engaging in such practices, Fraudulent Billing Practices, 1 F.C.C.2d 1068 (1965), and may under some circumstances be used as a scheme to violate the Clayton and Robinson-Patman Acts,

15 U.S.C. § 13 et seq. Applicability of Fraudulent Billing Rule, 23 F.C.C.2d 303 (1970).

3. 47 C.F.R. 73.1205 provides:

   "(a) No licensee of a standard, FM, or television broadcast station shall knowingly issue or knowingly cause to be issued to any local, regional or national advertiser, advertising agency, station representative, manufacturer, distributor, jobber, or any other party, any bill, invoice, affidavit or other document which contains false information ccn-

The record before the Commission in this case showed that White Mountain had engaged in double billing for the approximately five and one half-year period from February 1969 until August 1974. Essentially, appellant's custom was to send to its local advertisers two separate bills—one for the true cost and quantity of their advertising, and the other for an inflated amount which the local advertiser would forward to its national supplier or manufacturer as a basis for obtaining reimbursement pursuant to a cooperative advertising agreement. Although Powell became aware of this practice just after he acquired the radio stations in 1969,[4] and while at various times he considered a phase-out, he never actually took action to that end. On the contrary, he allowed new accounts to be initiated into the double billing scheme, and the practice continued until its discovery by a Commission investigation.

Powell conceded that he knew of the FCC's prohibition against double billing and he was aware of the risk that it might result in the loss of his stations' licenses; he only claimed that in view of the competitive market the elimination of double billing would have meant a loss of business.[5]

In April 1975, the Commission designated the matter for an adjudicatory hearing pursuant to section 309(e) of the Communications Act of 1934, 47 U.S.C. § 309(e). After two days of hearings and the submission of briefs and evidence, the Administrative Law Judge made findings of fraudulent conduct, knowing violations of Commission rules, and the absence of mitigating or compassionate circumstances. *See White Mountain Broadcasting Co., Inc.* (Initial Decision), FCC 76D–10 (January 29, 1976). He did not, however, recommend the denial of White Mountain's application for license renewal, but limited his sanction recommendations to the grant of a one-year renewal conditioned upon restitution of the double billing overcharges, and a forfeiture in the amount of $10,000.

On appeal, the Commission traced the history of its double billing policy[6] and

cerning the amount actually charged by the licensee for the broadcast advertising for which such bill, invoice, affidavit or other document is issued, or which misrepresents the quantity of advertising actually broadcast (number or length of advertising messages) or which substantially and/or materially misrepresents the time of day at which it was broadcast, or which misrepresents the date on which it was broadcast.

"(b) Where a licensee and any program supplier have entered into a contract or other agreement obligating the licensee to supply any document providing specified information concerning the broadcast of the program or program matter supplied, including noncommercial matter, the licensee shall not knowingly issue such a document containing information required by the contract or agreement that is false.

"(c) A licensee shall be deemed to have violated this section if it fails to exercise reasonable diligence to see that its agents and employees do not issue documents containing the false information specified in paragraphs (a) and (b) above."

4. Not only had he discussed the subject on several occasions with his general managers, but he had been questioned about it by the local newspaper.

5. Indeed, at least one other broadcast station in the Berlin, New Hampshire, locality was found to have engaged in double billing during substantially the same period; however, it, too, has been denied license renewal. An appeal from that decision is pending. See Berlin Communications, Inc., (Initial Decision) FCC 76D–48 (September 2, 1976); FCC 78–309, 42 R.R.2d 1513 (May 9, 1978), *appeal docketed, Berlin Communications, Inc. v. Federal Communications Commission*, No. 78–2048 (D.C.Cir., filed Oct. 25, 1978). See also note 8 *infra*.

6. On March 9, 1962, the Commission issued a public notice stating that it regarded the practice of double billing as reprehensible and contrary to the public interest, "and that appropriate proceedings will be instituted in all cases where evidence of double billing by licensees is found to exist." Public Notice B, Broadcast Licensees Warned Against Engaging in Double Billing, 44 F.C.C. 2828 (1962). Thereafter, when actions taken in individual cases failed to curtail the continued practice of double billing by some licensees, the Commission adopted an express rule (including an admonition to licensees to exercise reasonable diligence toward preventing their agents and employees from violating the rule) as a statement of existing policy, Fraudulent Billing Practices, 1 F.C.C.2d 1068 (1965), and it provided illustrations of the kinds of prohibited practices. Public Notice, Applicability of Fraudulent Billing Rule, 1 F.C.C.2d 1075 (1965). In 1970, the Commission

reaffirmed the principle that fraudulent conduct by licensees is neither excused nor mitigated by the knowledge or acquiescence of cooperative advertisers. See *White Mountain Broadcasting, Inc.*, 60 F.C.C.2d 342 (1976). Emphasizing the seriousness with which it viewed the violations in light of its repeated public warnings and rule-makings on double billing, the Commission concluded that the appropriate sanction was

to deny White Mountain's application for renewal of the license.[7] Appellant's motion for reconsideration on the ground that Powell neither knew of nor condoned the double billing was denied as without record support. This appeal followed.

II ·

The principal issue before the court[8] is appellant's contention that the

added language to the fraudulent billing rule "to make completely .clear its prohibition against outright false billing, the knowing rendition of any bill or other document which misrepresents the number of announcements run, their character, their length, or the date and time of their broadcast," Fraudulent Billing Practices, 23 F.C.C.2d 70 (1970), again gave examples of prohibited practices, and reemphasized that licensees must use reasonable diligence to see to it that their employees would not engage in fraudulent billing. Applicability of Fraudulent Billing Rule, 23 F.C.C.2d 303 (1970).

7. The Administration Law Judge had recommended lenient treatment for appellant largely because, in his view, the local advertisers who demanded double billing were far more culpable than the station-licensees, and even national manufacturers may .well be aware of and similarly accept double billing. Since all of these entities are beyond the reach of Commission jurisdiction and any effective sanction, he felt it to be inappropriate to impose upon the station owners the harsh penalty of the loss of its license. The Commission itself, however, has never accepted such a view, and has repeatedly found double billing to be a fraudulent practice incompatible with the status of a broadcast licensee, regardless of whether others, not subject to the Commission's jurisdiction, may escape unscathed. The exercise of discretion with respect to appropriate sanctions is peculiarly the responsibility of the Commission—not that of the Administrative Law Judge or this court. *Butz v. Glover Livestock Commission Co., Inc.*, 411 U.S. 182, 186–9, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *Continental Broadcasting Co. v. Federal Communications Commission*, 142 U.S.App.D.C. 70, 73, 439 F.2d 580, 583 (1971); *Greater Boston Television Corp. v. Federal Communications Commission*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *Kidd v. Federal Communications Commission*, 112 U.S.App.D.C. 288, 302 F.2d 873 (1962). Moreover, its discretion in the choice of remedies and sanctions is broad. See, *e. g., Federal Communications Commission v. Woko, Inc.*, 329 U.S. 223, 228–29, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Loraine Journal Company v. Federal Communications*

*Commission*, 122 U.S.App.D.C. 126, 351 F.2d 824 (1965).

8. Appellants also contend that the Commission lacks authority over double billing, that only the Federal Trade Commission has such authority, and that the Federal Trade Commission has taken little, if any, action to deal with this practice with respect to others, including competing New Hampshire media. There is no merit to these contentions. The public interest standard of the Communications Act implies that the licensee be law-abiding in the operation of the station, *Granik v. Federal Communications Commission*, 98 U.S.App.D.C. 247, 234 F.2d 682 (1956), and the Commission may properly consider anticompetitive or fraudulent practices of its licensees. *Metropolitan Television Co. v. Federal Communications Commission*, 110 U.S.App.D.C. 133, 135, 289 F.2d 874, 876 (1961); *Philco Corporation v. Federal Communications Commission*, 110 U.S.App.D.C. 387, 391, 293 F.2d 864, 868 (1961); *General Telephone Co. of Southwest v. United States*, 449 F.2d 846, 861 (5th Cir. 1971); Fraudulent Billing Practices, 2 F.C.C.2d 864 (1964). As for the alleged failure of the FTC to enforce double billing regulations against a Berlin, New Hampshire, newspaper, the record indicates that if that publication engaged in such practices at all, it did so only for a very brief period. In any event, the Federal Communications Commission is not foreclosed from exercising its public interest jurisdiction with respect to one of its licensees merely because another regulatory agency, which lacks such jurisdiction, has not attempted to use its resources in the particular area. See also, *Warner-Lambert Co. v. Federal Trade Commission*, 361 F.Supp. 948, 952–3 (D.D.C.1973); Fraudulent Billing Practices, 1 F.C.C.2d 1068, 1069 (1965). Whatever may be the culpability of those beyond the reach of the Commission—whether they be local advertisers or competing newspapers—the Commission is not to be faulted for dealing vigorously with misrepresentation among those entrusted with a public broadcasting license, or for not permitting that license to be pyramided into a money-making scheme through fraudulent means.

Commission failed in the obligation, first explicitly imposed upon it by *Melody Music, Inc. v. Federal Communications Commission*, 120 U.S.App.D.C. 241, 345 F.2d 730 (1965),[9] to explain its reasons for departing from prior precedents and, where it relies on factual differences with such precedents, to explain the relevance of the differences to the Commission's purposes and those of the Federal Communications Act. Specifically, appellant claims that other licensees whose conduct posed a greater threat to the public interest than the double billing practices found to exist in this case have been granted renewal, and that the Commission has failed to provide a rationale for the difference in treatment.

■ The Commission argues initially that since this contention was not raised at any stage of the administrative proceedings, the matter is not properly before the court. *Alianza Federal De Mercedes v. Federal Communications Commission*, 176 U.S.App.D.C. 253, 539 F.2d 732 (1976). However, the doctrine of exhaustion of administrative remedies is not absolute,[10] and insofar as appellant's difference-in-treatment argument is based primarily upon a determination made after the instant controversy had run its administrative course, it is appropriate for the court to consider the issue.

In *Melody Music, Inc., supra*, this court examined the Commission's decision not to renew the broadcast license of a Hollywood, Florida radio station whose sole shareholders had engaged in the deceptive practice of giving covert assistance to contestants on a network quiz show. The Commission found

that the prolonged deception of the viewing public was contrary to the public interest,[11] and that accordingly the station owners lacked the requisite character qualifications for a license. At the same time, although the National Broadcasting Company had participated in these quiz shows, turned its back on evidence that they might be counterfeit, and acted only when compelled to do so by outside factors, the NBC network stations had been granted license renewals without as much as a reference to the network's role in the episode.[12]

Faced with these disparate results, this court held that the Commission was required at a minimum to explain the difference between the treatment meted out to the Hollywood station and that accorded the network station license holders. We also noted that, while in other instances the FCC had granted renewals to licensees guilty of criminal violations of the antitrust laws, in the Hollywood case the agency found non-criminal conduct to be a sufficient basis for a failure to renew—a difference in treatment which was likewise held to call for an explanation in terms of its relevance to the purposes of the Federal Communications Act. Then, significantly in terms of the instant appeal, the court went on to state that, since the differences in the misconduct at issue were not "so 'obvious' as to remove the need for explanation," the case would have to be remanded to the Commission for further proceedings.[13]

Thus, in terms of the *Melody Music* precedent, which we regard as sound and reaf-

---

9. See also, *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 805, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Columbia Broadcasting System, Inc. v. Federal Communications Commission*, 147 U.S.App. D.C. 175, 454 F.2d 1018 (1971).

10. See, *e. g.*, *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1968); Layton & Fine, *The Draft and Exhaustion of Administrative Remedies*, 56 Geo.L.J. 315, 322–331 (1967).

11. The Commission also found that the shareholders had attempted to discourage initial grand jury and network investigations.

12. See *In re Applications of Nat'l. Broadcasting Co.*, Nos. 13085, 14091–92, 14054–56 (Initial Decision) (Nov. 20, 1963).

13. Similarly, Judge Fahy, concurring in the remand in *Melody Music*, suggested that criminal violations of antitrust laws by certain licensees were "so unrelated that I would require no further explanation from the Commission in this matter." 345 F.2d at 733.

firm today, the issue here is whether the differences between the conduct of White Mountain Broadcasting, whose license was not renewed, and that of others who were not denied renewals, are "so obvious as to remove the need for explanation." We hold that they are.

## III

Appellant claims that the Commission's license renewal to stations owned by the Columbia Broadcasting System in *CBS, Inc.*, 69 F.C.C.2d 1082 (1978), and the contemporaneous denial of its application for renewal, constitutes the kind of disparate treatment which calls for an explanation under *Melody Music.*[14] It thus becomes necessary to examine the facts and the Commission's actions in the CBS proceeding.

In February 1975, the CBS television network broadcast the first of a series of four tennis matches, extensively advertised as being played for $250,000 "winner-take-all." In fact, all of the participants received prize monies in various amounts depending upon their general standing and reputation as tennis professionals rather than upon their winning or losing the particular televised tournament.[15] After conducting its own investigation, and after giving due consideration to the so-called "Lane-Black report"

(an investigation by outside counsel) and a House of Representatives subcommittee investigation, the FCC determined that "prize" references made by CBS in connection with the matches were false and misleading, and that, at a minimum, CBS officials demonstrated a pattern of negligent conduct coupled with an apparent disregard for known facts. It concluded that the network itself should be held responsible both for the conduct of its officials in connection with the deceptive programming and for the "less than candid" attitude of its president with respect to the investigation. Rather than to designate the matters for hearing, however, the Commission, by means of a letter to CBS, suggested that a short-term renewal of one or more of its stations might be an appropriate sanction, deferring final action to give the network an opportunity to provide additional information of a mitigating nature. *See CBS, Inc., Tennis Match*, 67 F.C.C.2d 969 (1978).

Four months later, the Commission issued a statement in which it concluded that since the network as such had been candid with the staff,[16] had made full disclosure to the public in two special reports broadcast over 177 network television stations, had completely cooperated both with the FCC investigation [17] and that of the House committee, and had instituted corrective measures by adopting new internal procedures designed

---

14. Appellant also refers to the renewal of the licenses of two antitrust violators, *General Electric Co.*, 45 F.C.C. (Part II) 1592 (1964) and *Westinghouse Broadcasting Co.*, 44 F.C.C. (Part II) 2770 (1962). See note 13, *supra.* These matters occurred long before the present administrative proceeding involving this appellant and there is therefore no excuse for appellant's failure to raise them at the agency level. In any event, renewals notwithstanding antitrust violations not directly related to the use of broadcast facilities will not stand as a precedent for the automatic renewal of all broadcast licenses some fifteen years later, and the Commission will not be required to distinguish them every time a licensee is denied renewal.

15. For participating in the second, third, and fourth matches, Jimmy Connors received a total of $1,450,000; and for playing in the second, third, and fourth matches respectively, John Newcombe received approximately $280,000, Manuel Orantes received $250,000, and Ilie Nastase received $150,000.

16. It again found, however, that one or more network executives had lied to Commission investigators.

17. While the network's after-the-fact cooperation played a part in the final outcome, it was not a major factor. Moreover, the CBS cooperation and its remedial actions far exceeded both in relative scope and timeliness the feeble intentions expressed by this appellant.

to prevent a recurrence of the deceptive practices, only a short-time license renewal, rather than a designation for hearing for license revocation, was warranted. *CBS, Inc.*, 69 F.C.C.2d 1082 (1978). In reaching its decision, the Commission laid heavy stress upon the fact that the case was the first involving misrepresentations to the Commission by the network, and that network management appeared to have been unaware of the consequences of such misrepresentations.[18]

In our view, the differences between that case and the misconduct involving White Mountain are so patent that the Commission was not required to refer to them specifically in its decision in the instant proceeding.[19]

■ The involvement of White Mountain and its controlling stockholder was not limited to a single instance of misrepresentation but consisted of a fraudulent course of conduct extending over a five and one-half year period. Their misrepresentation, unlike that of *CBS*, was not of conceivably debatable legality in terms of the FCC rules, for the Commission had, again and again, warned against double billing, and it had warned also—as Powell well knew—that any licensee engaging in this practice risked license revocation. Indeed, absent strong mitigating circumstances,[20] the Commission has consistently implemented that policy and denied renewal in double billing situations. *E. g., United Broadcasting Co. of Florida, Inc.*, 55 F.C.C.2d 832 (1975), *recon. denied*, 60 F.C.C.2d 816 (1976); *Wharton Communications, Inc.*, 44 F.C.C.2d 489 (1973); *Eastminster Broadcasting Corp.*, 58 F.C.C.2d 24, *aff'd without opinion, Eastminster Broadcasting Corp. v. Federal Communications Commission*, D.C.Cir. No. 1797 (June 8, 1977).

Thus, with respect to the factors upon which *CBS, Inc.* turned—a single, relatively brief episode of wrongdoing coupled with a lack of knowledge of the applicable rules and consequences by the decision-makers—the instant case is wholly different, and the two situations can be equated only in the most superficial sense. For that reason, too, appellant's attempt to convert this case into a vehicle for demonstrating a Commission bias in favor of "media barons" and against the small, struggling radio stations falls far short of its mark. The record indicates to the contrary that, in this instance certainly, the difference in treatment had an obvious rational basis. In such circumstances, a remand to the Commission for further explanation of its decision would constitute an unnecessary and useless act, and the decision of the Commission is therefore

*Affirmed.*

---

**18.** The Commission made clear, however, that future misrepresentatives by network personnel would be attributed to the licensee corporation operating the network and would result in the designation of one or more of its licenses for revocation hearings.

**19.** It might be said, however, that the Commission's decision in *CBS, Inc.* in effect identified those very differences by its reliance upon factors which are clearly not present here.

**20.** In some instances, where the Commission found specific mitigating circumstances, it imposed a lesser sanction. See *Blackstone Broadcasting Corp.*, 52 F.C.C.2d 1106, 1111–13 (1975); *Bluegrass Broadcasting Co., Inc.*, 43 F.C.C.2d 990 (1973).