626 F.2d 869

**BERLIN COMMUNICATIONS,
INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS
COMMISSION, Appellee.**

No. 78–2048.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1979.

Decided Oct. 25, 1979.

John C. Quale, Washington, D. C., for appellant.

Roberta L. Cook, counsel, F.C.C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and C. Grey Pash, Jr., counsel, F.C.C., Washington, D. C., were on brief, for appellee.

Before MacKINNON and WILKEY, Circuit Judges, and GORDON,* United States District Judge for the Western District of Kentucky.

Opinion PER CURIAM.

PER CURIAM:

Appellant Berlin Communications, Inc. (Berlin) is the licensee of AM station WBRL in Berlin, New Hampshire. Berlin acquired the license in April 1971 and continued the practice of the prior operator of fraudulent billing of advertising accounts. This practice was continued until the investigation by the Federal Communications Commission in August 1974. Under the fraudulent billing plan merchants who had purchased

advertising on WBRL were billed by invoices which showed the correct number and cost of the commercial announcements broadcast by the station. However, in addition the merchants also received from Berlin, affidavits that misrepresented the cost or quantity, or both, of advertising on WBRL. The false affidavits were then submitted by the merchants to manufacturers for payment or credit of a percentage of the cost of the advertising shown on the fraudulent affidavit, pursuant to cooperative advertising agreements between the manufacturers and the local merchants. The Commission described "double billing" in its proceeding entitled *In re Matter of Fraudulent Billing Practices* as follows:

> The main ingredient of the practice is the furnishing of false information concerning broadcast advertising to any party contributing to the payment of such advertising, the purpose being to induce such party to pay more than the actual rate for the advertising.

1 FCC2d 1068 (1965). During the period covered by the Commission's investigation, twenty-two accounts with local merchants were issued these fraudulent affidavits by Berlin. These affidavits were in turn transmitted by the merchants pursuant to the advertising contract and resulted in overcharges of $22,390.81 to the manufacturers.

Richard L. Blais, president and 75% stock owner of Berlin, testified at the hearing that he was first informed that his station was double billing, as the practice is called, a few months after he acquired the station in 1971.[1] The owner of the Berlin newspaper reported to him that the newspaper and the two other, jointly-owned radio stations in Berlin, WMOU and WXLQ, also double billed. Mr. Blais then ascertained that WBLR was indeed fraudulently billing its accounts, but he allowed the practice to continue, deferring to the judgment of his general manager that the station would be forced out of business were it to cease the practice.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Transcript of the investigation of the ALJ at 88. Joint Appendix (JA) 362. Initial Decision of the ALJ, *Berlin Communications, Inc.*, FCC 76D–48, released Sept. 2, 1976. JA 96.

The Commission initiated its investigation in August 1974 and following the hearing the Administrative Law Judge determined that Berlin had violated Section 73.-1205 of the Commission's Rules, 47 C.F.R. § 73.1205.[2] This regulation prohibits a licensee from knowingly issuing or causing to be issued to any local or national advertiser any bill, invoice, affidavit, etc., which misrepresents the charge for or quantity, timing or content of advertising on its station, or failing to exercise reasonable diligence in supervising its employees' adherence to the rule. The Administrative Law Judge denied Berlin's application for renewal of its license, and this decision was affirmed by the Commission. 68 FCC2d 923 (1978), recon. denied, —— FCC —— (1978).

In appealing to the court,[3] Berlin does not deny its fraudulent billing, but instead objects to the severity of the sanction—nonrenewal of its license. Berlin contends, first, that imposition of this sanction is inconsistent with prior Commission policy and precedent, and second, that the Commission failed to take into account "mitigating factors" raised by Berlin.

We find no merit in Berlin's arguments and uphold the Commission's order. Furthermore, finding Berlin's actions to be an egregious violation not only of the Commission's Rules but believing that fraudulent double billing also may constitute a violation of the Mail Fraud and Conspiracy Statutes, 18 U.S.C. § 1341, 371 (1976),[4] we

---

2. 47 C.F.R. § 73.1205 (1978) provides:

(a) No licensee of a standard, FM, or television broadcast station shall knowingly issue or knowingly cause to be issued to any local, regional or national advertiser, advertising agency, station representative, manufacturer, distributor, jobber, or any other party, any bill, invoice, affidavit or other document which contains false information concerning the amount actually charged by the licensee for the broadcast advertising for which such bill, invoice, affidavit or other document is issued, or which misrepresents the nature or content of such advertising, or which misrepresents the quantity of advertising actually broadcast (number or length of advertising messages) or which substantially and/or materially misrepresents the time of day at which it was broadcast, or which misrepresents the date on which it was broadcast.

(b) Where a licensee and any program supplier have entered into a contract or other agreement obligating the licensee to supply any document providing specified information concerning the broadcast of the program or program matter supplied, including noncommercial matter, the licensee shall not knowingly issue such a document containing information required by the contract or agreement that is false.

(c) A licensee shall be deemed to have violated this section if it fails to exercise reasonable diligence to see that its agents and employees do not issue documents containing the false information specified in paragraphs (a) and (b) above.

3. Jurisdiction is conferred upon this court by § 402(b) of the Communications Act of 1934, 47 U.S.C. § 402(b) (1976).

4. The statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

As amended Aug. 12, 1970, Pub.L. 91–375, § 6(j)(11), 84 Stat. 778.

See also, 18 U.S.C. § 1343 (1976) (fraud by wire, radio, or television).

The Conspiracy Statute provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a

strongly recommend that the Commission report future instances of fraudulent billing to the appropriate office of the United States Attorney [5] for consideration of criminal prosecution.

## I

■ We distinguish three cases relied upon by Berlin in which a lighter sanction of monetary forfeiture was imposed for fraudulent billing. The licensee in *Blackstone Broadcasting Corp.*, 52 FCC2d 1106 (1975), double billed only two of its accounts. Although this practice lasted for six years, the overcharges were nominal, and no false affidavits were issued.[6] Berlin issued false affidavits in furtherance of a much more pervasive violation, involving twenty-two accounts and over $20,000.

In *Bluegrass Broadcasting Co., Inc.*, 43 FCC2d 990 (1973), and *Gateway Broadcasting Enterprises, Inc.*, 58 FCC 2d 63 (1976), principals of the licensees had no actual knowledge that their stations were double billing. In *Bluegrass* the principal was merely negligent in failing to stop a practice of which he was unaware; the principal in *Gateway* thought that false affidavits were accurate when he prepared them. Absent this finding, said the Commission on review in *Gateway*, denial of license renewal would have been the appropriate sanction. In stark contrast, Richard Blais, principal of Berlin, knew of his station's violation and authorized its continuation until the time of the FCC's investigation.[7] This aiding and abetting is sufficient under 18 U.S.C. § 2 to constitute him a principal in the criminal violation of others.

Cases in which the Commission imposed a lighter sanction than non-renewal of license involved less egregious violations of the double billing rule than did Berlin's flagrantly fraudulent billing practices that were intentionally continued over a three year period with the admitted knowledge of the principal owner of the license. In pointing out this distinction we do not necessarily approve of the lesser sanctions imposed by the Commission in other cases, but neither can we say that the sanction that we approve here for these more egregious violations is inconsistent with Commission precedent.

## II

Berlin's next claim is that the Commission should have taken into account certain alleged mitigating factors that would dictate a softening of the sanction to be levied. After even a sympathetic examination of Berlin's conduct, we fail to see any mitigating factors.

### A

■ *Business Necessity:* Berlin outlines a scenario in which it asserts that it was

---

misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. 18 U.S.C. § 371 (1976).

5. Reference of the instant case to the United States Attorney for consideration of the institution of criminal proceedings would be appropriate except for the possibility that the prosecution might be barred by the five year statute of limitations, 18 U.S.C. § 3282 (1954).

6. *See also* dissenting opinion of Chairman Wiley, joined by Commissioner Robinson, arguing that even this "petty offense" against the fraudulent billing regulation is sufficiently contrary to the public interest to warrant revocation of Blackstone's license. 52 FCC 2d at 1113, 1114.

7. Berlin is forced to attempt to distinguish *White Mountain Broadcasting Co., Inc. v. FCC,* 194 U.S.App.D.C. 355, 598 F.2d 274 (D.C.Cir. 1979) because in that case we affirmed the FCC's denial of license renewal to stations WMOU and WXLQ, the jointly-held radio stations in Berlin, New Hampshire, *also* found in violation of the rule against fraudulent billing. Berlin hopes to establish the superior character of its principal, Richard Blais, by comparison with the principal in *White Mountain*, who was double billing before Blais purchased WBRL, and allegedly refused Blais' entreaties to cease the practice.

Berlin cannot excuse its conduct by reference to the wrongdoing of others. That the *White Mountain* stations' illegality preceded that of Berlin does not diminish the fact that Berlin willfully engaged in conduct violative of the Commission's rules. The facts of *White Mountain, supra*, are too similar to allow distinction; moreover, standing alone, Berlin's conduct justifies the sanction of nonrenewal. *See* discussion *infra* at 9–12.

forced by competitive pressures to engage in fraudulent billing. As both the newspaper and other radio stations in town refused to cease the practice, Berlin states that it reluctantly double billed its advertising accounts as well. Failure to do so, Berlin asserts, would have meant the loss of key advertising accounts and resultant competitive ruin. Berlin admits that it could have reported the illegal activities of its neighboring radio stations to the Commission, but excuses this failure by pointing out that the newspaper was not regulated by the Commission, and would presumably succeed to a monopoly of all the advertising business in Berlin.

Berlin's contentions are contradicted by the record, and by common sense. The newspaper indicated its willingness to stop double billing as early as 1972, and had done so by the time of the Commission's investigation.[8] But more importantly, Berlin could have announced its intention to stop double billing to its competitors at any time and could have told them that it would report their continued violations to the United States Attorney and local criminal prosecutor, in the case of the newspaper, as well as to the FCC in the case of the radio stations. Arguing that the newspaper is "unregulated" is nonsensical in the face of criminal statutes awaiting application to such cases of fraud and obtaining money under false pretenses by the parties involved.[9] Furthermore, it is elementary that

8. Brief for Commission at 28, 29.

9. See e. g. New Hampshire Revised Statutes Annotated (1979) §§ 637:4 (theft by deception), 638:6 (deceptive business practices); 18 U.S.C. § 1341, § 2 (mail fraud); 18 U.S.C. § 371 (conspiracy).

The record in this case indicates apparent violations of the Federal Mail Fraud Statute. (A.97) To assist the Commission in evaluating future cases we explain our analysis of the instant case in detail. There is no question that both Blais and the merchants participated in a scheme to knowingly defraud the national advertisers. Berlin mailed the false affidavits to the merchants (A.97) who collected on them from the advertisers. The Administrative Law Judge made the explicit finding that the false affidavits were sent by Berlin to the merchants via U. S. Mail. (A.97) This mailing in pursuance of a scheme to defraud indicates a violation of the Mail Fraud Statute by the merchants, Blais and other participating knowledgeable employees of Berlin. Even if the invoices and affidavits had been hand delivered by the station in Berlin to the merchants, who in turn mailed them to the national advertisers, that could constitute mail fraud by the local merchants. And Blais and knowledgeable employees of Berlin who participated could be guilty as principals under 18 U.S.C. § 2 because in furnishing the false affidavits they aided and abetted mail fraud. Also, the station and all individuals involved there could be guilty of separate unlawful completed conspiracies with each local merchant to commit mail fraud contrary to 18 U.S.C. § 371. The mailing to the merchants of the invoices and false affidavits, and even their delivery by hand with the subsequent mailing of such invoices and affidavits to the parties ordering the advertising, could constitute overt acts in pursuance of the conspiracy. Each mailing of an invoice or false affidavit for each advertisement could constitute a separate overt act.

Blais and the participating employees at the station were not the only ones who appear to have violated these laws. A number of local merchants also participated in the double billing scheme, benefitted from it and refused to stop it.

1. The Commission found in its Decision that false affidavits issued by Berlin to merchants were in most cases forwarded to national manufacturers for payment or part payment. (A.180) 68 FCC 923, 924 (1978).

2. The Decision of the Administrative Law Judge lists 22 accounts of local merchants by name that received false affidavits from Berlin and presumably passed these on to the national advertiser/manufacturers. (A.98–107).

3. Under WBRL's prior operator double billing occurred as early as 1966. (Tr. 363–66).

4. The Initial Decision of the ALJ in the White Mountain case involving Berlin stations WMOU and WXLQ found 14 merchants who also participated in double billing with WBRL. There was also testimony by two merchants that their accounts had been double billed since 1969. Initial Decision of the ALJ, White Mountain Broadcasting Co., Inc., February 5, 1976, aff'd 60 FCC 2d 342 (1976), aff'd. sub nom. White Mountain Broadcasting Co., Inc. v. FCC, 598 F.2d 274 (D.C.Cir., 1979). App. A 14.

5. The general manager, Robert Dale, at the request of Blais the principal, spoke to two local advertising merchants to see if it were possible to stop false billing. Dale reported back to Blais that with these two merchants there was "no chance" that they would terminate the practice. Testimony of Dale before the ALJ, (A 377–9); Statement of Blais, A 213.

6. Blais testified on direct examination before the ALJ that all the media in Berlin double

fraudulent conduct by licensees is not mitigated because of participation by others in the scheme, or the desire to protect business profits. *White Mountain Broadcasting Co., Inc.*, 60 FCC 2d 342, recon. denied, 61 FCC 472 (1976), aff'd, *White Mountain Broadcasting Co., Inc. v. FCC*, 194 U.S.App.D.C. 355, 598 F.2d 274 (D.C.Cir.1979); *Monroe Broadcasters, Inc.*, 60 FCC2d 792, 796 (1976), recon. denied, 61 FCC 716 (1976).

■ *Lack of Injury to National Advertisers:* Berlin submits that the national advertisers' failure to request full restitution after they were sent notice of the fraudulent billing indicates a lack of injury that should be considered in mitigation of Berlin's violations. Berlin also argues, in effect, that the national advertisers are themselves responsible for their losses because of their "lax practices" and "passive acceptance".[10]

We wonder at Berlin's curious attempt to "blame the victim." It occurs to us that the national manufacturers who have paid the cost of Berlin's violations may not even be aware of the offenses committed against them. The record does not reveal whether it was they who were notified, or their advertising agencies. We cannot accept Berlin's attempt to shift the blame for its acts to its victims, nor is it reasonable to regard the loss of more than $22,000 as

non-injurious. Even if we were to accord weight to Berlin's argument that lax practices of the national advertisers "encouraged" the fraudulent billing, that would not be a defense to the Commission's acting as it did. The FCC must fulfill its responsibility to the public by "dealing vigorously with misrepresentation among those entrusted with a public broadcasting license." *White Mountain Broadcasting Co., Inc. v. FCC, supra,* (at 277). Berlin's conduct does not reflect creditably upon its qualification to operate a license in the public interest.[11]

■ *The Principal's Lack of Participation:* Although Berlin admits that its principal, Mr. Blais, had explicit knowledge of the fraudulent billing by the station over a long period of time, it contends that his lack of actual direct involvement in the daily mechanics of creating the fraudulent documents [12] somehow removes him from serious culpability. The Commission found, however, that his failure to stop the practice was "tantamount to instituting intentionally the illegal billing activities". We agree. He is a principal in the offense just the same as if he personally prepared the false affidavits.[13] In its most favorable light, Blais' conduct is the "active indifference" that the Commission views as "unfavorably as an intentional abuse". *United Broad-*

---

billed. A 356, Initial Decision of the ALJ, *supra* n. 1.

**10.** Appellant's Brief at 43.

**11.** § 303(*l*)(1) of the Communications Act of 1934, 47 U.S.C. § 303(*l*)(1) gives the Commission authority to prescribe the qualifications required of station licensees; § 307(d) of the Act states that license renewal may be granted "if the Commission finds that public interest, convenience, and necessity would be served thereby." The public interest standard implies a requirement that the licensee be law abiding in the operation of its station. *Report and Order re Fraudulent Billing Practices,* 1 FCC 2d 1068, 1069 (1965). *FCC v. American Broadcasting Co.,* 347 U.S. 284, 290, 74 S.Ct. 593, 98 L.Ed. 699 (1954).

**12.** Blais stated that he "had no reason to suspect that double billing extended beyond a few accounts" and did not know that false affidavits, rather than false invoices, were issued. Statement of Richard Leo Blais, JA 206,214. His lack of knowledge of the *actual* mechanics

of the fraudulent scheme is not a defense. He knew from the very start that his employees were engaged in a scheme of fraudulent billing and it is immaterial that he may have thought false invoices instead of false affidavits were used. Both violate the regulations and most likely the criminal statutes. The Commission found that "the record was insufficient to establish that the licensee's principal had participated *directly* in the double billing scheme". 68 FCC 2d at 925 (1978). (Emphasis added).

**13.** 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

As amended Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717.

*casting Co. of Florida, Inc.,* 55 FCC 2d 832, 839 (1975), *recon. denied,* 60 FCC 2d 816 (1976).

To our mind, the so-called mitigating factors submitted by Berlin serve to remind us of the seriousness of the violation. We find the sanction imposed by the Commission to be fully warranted.

### III

█ We affirm the Commission's order denying Berlin's application for license renewal, but we are compelled to add a few observations. This appeal presents us with a case of clearly fraudulent activity. Berlin's conduct is incompatible not only with the standards expected by law of licensees of the airwaves, but is also incompatible with federal and local criminal statutes.[14] It appears to us that Berlin and other violators of the double billing rule simultaneously offended 18 U.S.C. § 1341, the Mail Fraud Statute, the Conspiracy Statute, 18 U.S.C. 371 and the local statutes proscribing the obtainment of money under false pretenses. The Commission *In the Matter of Fraudulent Practices,* 1 FCC 2d 1068, 1070 (1965) recognized the existence of criminal penalties against "double billing". However, it also appears to us that the Commission has not been giving sufficient consideration to the fraudulent conduct implicit in double billing as the serious *criminal* violation that it constitutes. In our opinion the Commission has a responsibility to refer such cases to the United States Attorney[15] for consideration by the grand jury when the violation of the criminal law is of the magnitude and as obvious as that on display here.

In all other respects, we approve of the actions of the Commission, and affirm its decision.

*Judgment accordingly.*

**14.** *See* notes 4 and 9, *supra.*

**15.** We note that § 401(c) of the Communications Act, 47 U.S.C. § 401(c) (1976), grants the Commission authority to direct that the United States Attorney prosecute all violations of the Act. Certainly this provision assumes even

greater importance when the violation in issue contravenes federal criminal laws as well.

The Commission has evidenced its awareness that fraudulent billing usually involves use of the mails to defraud. *See Report and Order re Fraudulent Billing Practices,* 1 FCC 2d 1068 (1965).